## Price v. Price.

December 16, 1947.

C. C. Duncan, Special Judge.

Ben D. Smith for appellant.

Sam C. Kennedy for appellee.

OPINION OF THE COURT BY JUDGE KNIGHT—Affirming.

## Statement of Case.

Appellee brought suit against appellant for absolute divorce on the ground of six months cruel treatment. She prayed for alimony in the sum of fifty dollars per month, for restoration of her maiden name, for custody of their infant daughter then 2½ years old, and fifty dollars per month for the child's maintenance, and for costs and her attorney's fee. Appellant denied the allegations of the petition, counterclaimed for absolute divorce against appellee, and custody of the infant daughter.

Considerable proof was taken on both sides and upon submission Special Judge Duncan entered a judgment granting an absolute divorce to appellant on his counterclaim, but awarded custody of the infant daughter to appellee, with certain rights of visitation by appellant, who was directed by the judgment to pay appellee the sum of twenty-five dollars per month for maintenance of the child. The judgment restored appellee to her maiden name and awarded her costs and attorney's fee of one hundred dollars. From so much of that judgment as awards custody of the child to appellee the appellant prosecutes this appeal, asking its reversal on that point. This is the only question involved in this appeal.

## The Evidence.

It would serve no useful purpose to review the evidence under which the Chancellor reached his conclusion as to which party was entitled to the divorce

since his decision on that phase of the case is not subject to review by this court. Only so much of the testimony as bears upon the question of the custody of the child will be considered, although the entire record has been carefully read for background and for such assistance as it will give in an effort to reach a proper decision.

So far as the record shows the home in which the child will live and be brought up will be one of two Somerset homes, either that of appellant's father and mother, Mr. and Mrs. Orlando Price, with whom he lives, or that of Mr. and Mrs. Sam Hord, father of appellee, with whom she lives, as shown by this record. Both have modern homes and both are described in the testimony as Christian homes, and the child has the affection of her grandparents on both sides. There appears to be little choice between the two homes as a place in which the child will be nurtured and cared for, and the grandparents on both sides seem equally desirous of having the child in their home.

As to appellant's fitness and suitability to have custody of the child, had such custody been awarded him, little need be said. The charges brought by the wife in her divorce suit, and the evidence brought out by her to sustain those charges, throw no reflection on his character or his moral conduct except to show that he had been previously divorced from his first wife. Appellee's charges were based largely on what she regarded as his stinginess toward her and the undue extravagance lavished on himself while he was an officer in the late war, in the purchase of fine uniforms and expensive automobiles. With the war over and appellant now settled down to the trucking business, these extravagant habits, if such there were, have no doubt ceased and would have no bearing on his qualification for present custody of the child.

The sole question to determine is: Does the evidence in the record so reflect on the moral character of the appellee as a person unfit to have the custody of her young daughter, now 3½ years old, and to justify us in departing from the usual rule that the mother is the proper one to have custody of a female child of tender years?

The evidence against appellee is largely of her own making. It is embraced in one or two letters addressed to "Sugar" and unsigned, but identified as being the handwriting of appellee. Apparently they were never mailed to "Sugar" but were found among her personal belongings by her husband's parents and shown to him on his return home from the army. These letters were more in the nature of a diary in which she poured out her real feelings for her "Sugar." From the silly mouthings contained in this diary, or these letters, it is quite clear that her real love was for him and not for her husband, as her letters to the latter, also introduced in the evidence, clearly show. There is some inference from this dairy that appellee and her "Sugar" had occupied a room together some place as she says at one place, "I've got on the pajamas you like, remember, huh! Room 232—rough, but definitely wish we were there now don't you???" There are other words of endearment like—"I love you and love you forever," and "My Sugar almost forgot to kiss me last night." However, there is no actual proof of any improper sex. relations with "Sugar," whose identity she absolutely refused to disclose at the trial. Other evidence, however, fairly well establishes, at least by implication, that he is John Tom Anglin, and there is evidence that she was seen with him and had telephone conversations with him at various times during her husband's absence in the army. More will be said about him later.

The only letter in the record identified as having been received by appellant from appellee while he was away in the army, and which was dated January 24, 1943, shows no such endearing terms as those contained in her diary to "Sugar" and appears to indicate a struggle going on within her whether to break completely with him or try to patch things up and go on as his wife. She signs this letter—"Love (is this OK) Your wife (for how long I don't know.) P. S. Everything is left up to you now concerning a divorce. You are the one to get it, not me."

In another letter written to appellant from appellee dated December 1, ——, but never mailed to him, found with her other diary letters, she condemns herself se-

verely, paints a black picture of herself, says she has been playing cards and drinking for a month; that she had lost weight and looks like hell, is disgusted with herself and is not fit to be his wife or the wife of any other man. This letter, or diary entry, appears to have been written by appellee when she was in one of her fits of depression and disgust with herself, and was apparently written with the hope that it would result in her husband divorcing her, and which she suggests in the letter to him dated January 24, 1943, which she mailed to him.

It is fair to say that, taken as a whole, the evidence does not paint appellee as black as do these descriptions of herself as given in her diary entries. These pictures are far from beautiful but they were part of the testimony on which the Chancellor based his decision in her favor. They do show clearly that she had no love for appellant but that she was in love with Jim Tom Anglin. While it is not shown in the record, it is said for the first time in the brief of counsel for appellant that appellee married this Jim Tom Anglin shortly after the divorce judgment was entered and now lives with him in Memphis.

There is nothing in the record to show that appellee was guilty of any promiscuous immorality, but such immorality as is shown is the result of her undoubted love for the man whom we are informed she later married. As has so often happened, the failure, the frustration, the unhappiness of the first marriage may be succeeded by the success and happiness of the second marriage. That remains for the future to determine, and the decision we reach here does not close the door to appellant if changed conditions justify a new application for custody of the child.

### The Law of the Case.

Having in view the welfare of the child it is the settled practice in this state, in case of divorce, to award the custody of a child of tender years, especially a girl, to the mother, unless it be made to appear that she is not a suitable person. Wills v. Wills, 168 Ky. 35, 181 S. W. 619, and cases therein cited.

Isolated acts of misconduct on the part of the moth-

er will not change this rule if in other respects she appears to be qualified to have custody of the child. Thus in Wilson v. Wilson, 271 Ky. 631, 112 S. W. 2d 980, where the mother of the child killed the second wife of her former husband, the custody of a daughter ten years old was permitted to remain with her upon a showing that the child was well trained and well cared for and chose to remain with her mother.

In Ruttencutter v. Ruttencutter, 293 Ky. 556, 169 S. W. 2d 604, a mother was not denied the custody of her boy eight years old, even though proof showed that she lived in an apartment in Washington for several months during which time she received frequent visits in her room from a male friend, and that the couple reputedly passed among the occupants of the apartment as man and wife.

The case that most nearly fits the instant case is that of Clark v. Clark, 298 Ky. 18, 181 S. W. 2d 397, 398. In that case the custody of a 5½ year old boy was involved, and in refusing to take the custody away from the child's mother, this court, through Chief Justice Fulton, said:

"In these circumstances it is indeed difficult to determine whether the custody of the child should have been given to the appellee or to the appellant. The paramount consideration is, of course, the welfare of the child. The child is very young and the courts are always loath to deprive a mother of the custody of very young children. It is only when it clearly appears that the mother is an unfit person to have the custody of a young child that she should be deprived of it. The evidence here does not establish that the appellee has been promiscuously immoral. There is no intimation that she was ever guilty of indiscretion with any man other than Purdy. She evidently was in love with him since she was procuring the divorce to marry him and, as stated in the appellant's brief, she did marry him after the divorce was granted."

In awarding custody of children in a divorce suit, very large discretion must be permitted to the Chancellor, and it is only where this discretion has apparently been abused that this court will interfere with his decision. From a reading of this entire record we are

not prepared to say that that discretion was abused in this case. The Chancellor evidently knew the parties involved here, their background and what would be the best for the welfare of the child involved, and we do not feel that his decision should be disturbed on the record as it now stands. The court retains control of the action for the purpose of regulating the custody of the child and may at any time modify the order with reference to the child's custody on a showing of changed conditions. If appellant is able at some future time to show himself more advantageously suited to care for the child, or that the appellee has not shown herself to be the proper person to have its custody, he can again have the case reopened and the custody changed if conditions then warrant it.

The decision of the lower court is affirmed.